IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

MARLENE THOMAS,

Plaintiff,

v.

SOUTHWESTERN VIRGINIA TRANSIT MANAGEMENT COMPANY, Inc., and FIRST TRANSIT, Inc.,

Defendants.

Civil Action No.: 7:19-cv-00652

**AMENDED MEMORANDUM OPINION AND ORDER**[1]

Marlene Thomas filed a complaint alleging claims for quid pro quo sexual harassment and hostile work environment against Southwestern Virginia Transit Management Company, Inc. (SVTMC) and First Transit, Inc. (First Transit). Defendants move to dismiss for failure to state a claim. (Dkt. No. 21.) The court finds that Thomas plausibly alleged timely claims for relief under Title VII. Therefore, defendants' motion to dismiss will be denied.

## I. BACKGROUND[2]

### A. Employment at Valley Metro

First Transit and its subsidiary SVTMC jointly operate Valley Metro, the public transportation provider for the Roanoke Valley. Thomas was hired by SVTMC in June 2014 to work as an information officer. Thomas' job duties consisted of selling bus tickets, entering sales

---

[1] Defendants originally moved to dismiss on February 4, 2020. (Dkt. No. 11.) After that motion was fully briefed, plaintiff filed an amended complaint. (Dkt. No. 20.) Defendants then filed a new motion to dismiss. (Dkt. No. 21.) The court's Memorandum Opinion and Order at Docket No. 27 substantively addressed the first amended complaint (Dkt. No. 20) and the newly-filed motion to dismiss (Dkt. No. 21), but mistakenly failed to order that Dkt. No. 11 was mooted by the amended complaint or that the motion to dismiss at Docket. No. 21 was being denied. This Amended Memorandum Opinion and Order is being entered to fix this oversight. In all other respects, it is identical to the original Memorandum Opinion and Order.

[2] The following factual background is taken from the allegations in the first amended complaint, which are accepted as true for purposes of this motion.

into a database, answering phone calls, announcing buses when they entered the terminal, entering changes to bus routes on the board, and similar duties. Thomas worked in a confined space that included a window through which she transacted with customers and a single door to enter and exit. She was employed as an information officer for Valley Metro until July 24, 2019.

**B. Interactions With Carl Palmer**

Beginning in February 2016, Valley Metro General Manager Carl Palmer began visiting Thomas' workspace approximately two to three times per week, sometimes more. Thomas did not work in the same facility as Palmer's office. Initially the visits appeared to be related to work. After a couple of visits, however, Palmer began giving Thomas unwanted attention unrelated to her work. Palmer made sexually seductive facial expressions and requested that Thomas call him. When Thomas asked why that would be necessary, Palmer looked around and replied that he could not talk to her at that time because people were watching. Palmer continued to visit Thomas two or three times per week. During subsequent visits, Palmer made sexually suggestive eye and facial gestures and told Thomas he was still waiting for her to call. Because of Palmer's behavior, and because he would not discuss whatever he wanted to discuss in the workplace, Thomas believed that Palmer did not want to discuss something work related, and she did not call Palmer.

In early March 2016, during one of Palmer's visits to her office, Thomas asked Palmer how Valley Metro gives raises. Palmer responded that raises needed to be approved by City Council who would make sure there was money in the budget to give the raise. Thomas said she was asking about raises because she had been promised a raise by someone in human resources. Palmer told Thomas that he would check with her current supervisor and have him get back to her about the raise. Palmer then placed his hand around Thomas' lower back, smiled and winked at Thomas and said, "see you later" in a sexually seductive manner. Thomas immediately pushed Palmer's hand off her back, opened her office door, and let him out of her office.

The next day, Thomas went to the human resources office and asked about the process of reporting sexual harassment. Thomas was told that human resources would inform Palmer of the complaint. Fearing retaliation, Thomas decided not to file a report.

One week later, Thomas was at the downtown office for work and Palmer asked her to stop by his office before she left. When Thomas entered Palmer's office, Palmer handed her his business card with his cell phone number and asked her to call him on his cell phone. On another occasion when Thomas was at the downtown office, Palmer asked Thomas why she had not called him. Thomas asked Palmer what he wanted to talk about, and he responded that he could not talk to her at work because "there were too many prying eyes."

In April 2016, although Thomas had never given Palmer her personal phone number, Palmer called Thomas on her cell phone while she was not working. During the conversation, Palmer told Thomas that he wanted to have sex with her in a Bedford hotel over Memorial Day weekend. Palmer explained that his wife would be away that weekend and he would not have any problems once he took his "little blue pill." Palmer's proposition bothered Thomas deeply, and she was scared that if she did not comply with Palmer's wishes, she would suffer negative consequences at work, including termination.

After the phone call with Palmer, Thomas tried to avoid him at work and specifically to avoid discussing his proposition with him. Palmer continued to call Thomas and stop by her office two or three times per week to discuss his sexual proposition, which he referred to as their "meeting." Each time Palmer began discussing the proposition, Thomas would avoid the discussion by changing the topic of conversation, informing Palmer she was attending to customers, or looking like she was too busy to discuss it. Palmer's calls and interruptions affected Thomas' ability to perform her work with Valley Metro customers.

Although Palmer repeatedly told Thomas he would call her before Memorial Day to arrange a hotel meeting, Palmer did not call. This was a relief to Thomas as she was fearful of the consequences of rejecting Palmer's advances. Palmer's behavior caused Thomas to experience anxiety and stress, loss of sleep, nervousness at work, depression, weight gain, hair loss and other symptoms, and she eventually sought the assistance of a counselor.[3]

Although Palmer had not called Thomas to meet over Memorial Day 2016 weekend, he continued to call and visit her at work. In June 2016, Palmer visited Thomas approximately once per week. In July 2016, Palmer visited Thomas approximately two or three times per week. During a visit in July, Palmer asked Thomas if she had a boyfriend or "significant other."

From February 2016 through July 2016, Thomas periodically asked Palmer about the status of her raise during his visits and calls. Each time Thomas inquired, Palmer said he would look into it and have her supervisor get back to her.

In or around August 2016, Palmer asked Thomas to come into his office. The two had a discussion during which Thomas told Palmer that she never intended to have sexual relations with him over Memorial Day weekend. Thomas also told Palmer that she felt belittled and that she was not worth anything more than sex, and he just wanted sex and did not even ask her to go on a date. Thomas also told Palmer that she was scared and intimidated because, as general manager, Palmer is the boss and she was afraid of being fired. Palmer told Thomas that he recognized he had put Thomas in a bad position, but that he had feelings for Thomas and his attraction had not changed. Even though Thomas informed Palmer that she wanted to go through her day without his unwanted attention, Palmer suggested they go to dinner and a movie.

[3] After Memorial Day weekend, Thomas was speaking with a group of coworkers at work when Palmer approached them. One of the other employees asked Palmer about his Memorial Day. Palmer responded that he experienced a "rough weekend" because "something unexpected came up that he had to deal with."

In November 2017, Thomas reminded Palmer the he had never responded to her request that he look into the raise that had been promised to her. Palmer grabbed Thomas' hand, rubbed it in a sexually suggestive manner, smiled and winked and said, "I will see what I can do." Thomas pulled her hand away and told Palmer that he was being inappropriate. About a week and a half later, Palmer told Katie Domingo, a human resources administrator, and Doug Thompson, Assistant Director of Transportation, to deny Thomas' raise.

On information and belief, Palmer had sexual relations with other female employees to whom he provided raises, promotions, and other preferential treatment.

**C. Charge of Discrimination**

Thomas filed her discrimination charge August 22, 2018. (Defs.' Br. Ex. A, Dkt. No. 22-1.)[4] The EEOC issued a right-to-sue letter on June 28, 2019. (Defs.' Br. Ex. B, Dkt. No. 22-2.) The letter indicated the EEOC was closing its file on the charge because it "was not timely filed with the EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge." (*Id.*)

## II. ANALYSIS

**A. Motion to Dismiss**

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a complaint. *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). Rule 12(b)(6) requires a plaintiff to alleges sufficient factual allegations to "raise a right to relief above the speculative level." *Bell Atl.*

---

[4] Thomas did not attach the discrimination charge or right-to-sue letter to her complaint, but defendants attached them to the motion to dismiss. The court can consider these documents without converting this motion into a summary judgment motion. *See Nash v. Braswell Foods*, Civil Action No. 3:16cv592, 2017 WL 810288, at *1 n.1 (E.D. Va. Feb. 28, 2017) ("The Court will consider [the charge of discrimination and right-to-sue letter] because [plaintiff] referred to them in his Complaint, they are integral to his claim, and neither party disputes their authenticity."); *Ijames v. Murdock*, No. 1:01CV00093, 2003 WL 1533448, at *2 n.2 (M.D.N.C. Mar. 21, 2003) (stating that the court can consider charge of discrimination and right-to-sue letter without converting 12(b)(6) motion into a summary judgment motion because the complaint refers to both and "these documents are central to Plaintiff's claim in that Plaintiff must rely on these documents to establish that he has exhausted his administrative remedies under Title VII").

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, a plaintiff must plead sufficient factual matter, which when accepted as true, "state[s] a claim to relief that is 'plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible if the factual allegations allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When assessing a complaint's plausibility, courts must accept as true all factual allegations beyond mere recitals of a cause of action or mere conclusory statements. *Id.*; *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).

**B. Timeliness**

Before filing a discrimination claim under Title VII in federal court, the claimant must timely file a charge of discrimination with the EEOC. 42 U.S.C. § 2000e-5(e)(1), (f)(1). In Virginia, a so-called "deferral" state,[5] the claimant must file her EEOC charge within 300 days of the date of the alleged unlawful employment practice. *Id.* § 2000e-5(e)(1); *Maggard v. Kids Cent., Inc.*, Case No. 2:19CV00048, 2020 WL 1539293, at *3 (W.D. Va. Mar. 31, 2020). This time period operates, essentially, as a form of statute of limitations. *See Nat'l R.R. Pass. Corp. v. Morgan*, 536 U.S. 101, 122 (2002) ("We conclude that a Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate time period . . . set forth in 42 U.S.C. § 2000e-5(e)(1)."). In other words, if a plaintiff did not timely file her charge, then the subsequent civil suit is time-barred as well. Because Thomas filed her discrimination charge on August 22, 2018, only claims that arose on or after October 26, 2017, would be timely.

[5] The standard limitations period for filing a charge is 180 days after the alleged unlawful employment practice, but the period is extended to 300 days when state law proscribes the alleged employment practice and the charge has initially been filed with a state or local deferral agency. *See Hentosh v. Old Dominion Univ.*, 767 F.3d 413, 417 (4th Cir. 2014).

A "discrete retaliatory or discriminatory act occurred on the day that it happened." *Morgan*, 536 U.S. at 110; *see also Price v. Litton Bus. Sys., Inc.*, 694 F.2d 963, 965 (4th Cir. 1982) ("[T]he filing period runs from the time at which the employee is informed of the allegedly discriminatory employment decision."). Discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire." *Morgan*, 536 U.S. at 114. When an employee is asserting complaints about non-discrete acts, occurring before the 300 days, the continuing violation theory may apply. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007). Under the continuing violation theory, a plaintiff may pursue "incidents that occurred outside the time bar when those incidents are part of a single, ongoing pattern of discrimination." *Id.* at 219–20. The continuing violation theory applies to hostile work environment claims, which occur "over a series of days or perhaps years" and are "based on the cumulative effect of the individual act." *Morgan*, 536 U.S. at 115. Consideration of "the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purpose of assessing liability, so long as any act contributing to that hostile work environment takes place within the statutory time period." *Id.* at 105.

In her claim for quid pro quo sexual harassment, Thomas alleges that her rejection of Palmer's repeated sexual advances was used as the basis for adverse employment actions. For timeliness purposes, this claim falls in the category of a discrete act. Therefore, Thomas must allege an adverse employment action that occurred on or after October 26, 2017. As recounted above, Thomas alleges that in November 2017, Palmer made an inappropriate sexual advance, which she rejected, and about a week and a half later, Palmer facilitated the denial of a raise promised to Thomas. Thus, Thomas has alleged a timely quid pro quo sexual harassment claim. Further, Palmer's sexual advances in November 2017 are part of an ongoing pattern of behavior stretching back to February 2016. Under the continuing violation doctrine, Thomas' hostile work

environment claim is also timely. *See Edwards v. Murphy-Brown LLC*, 760 F. Supp. 2d 607, 620 (E.D. Va. 2011) ("If acts outside the statutory window contribute to a hostile work environment, the Court may consider all of those acts so long as any act contributing to that same hostile work environment occurs within the statutory window. Such a timely-act 'anchors' the previous acts that occurred more than 300 days before the charge, making them also timely under the continuing violation doctrine.").

**C. Quid Pro Quo Sexual Harassment**

Quid pro quo sexual harassment is defined as "harassment in which a supervisor demands sexual consideration in exchange for their job benefits." *McKinnish v. Donahoe*, 40 F. Supp. 3d 689, 697 (W.D.N.C. 2014) (quoting *Katz v. Dole*, 709 F.2d 251, 254 (4th Cir. 1983)). To state a claim for quid pro quo sexual harassment, a plaintiff must establish: (1) the employee belongs to a protected group; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment complained of was based upon sex; (4) the employee's reaction to the harassment affected tangible aspects of the employee's compensation, terms, conditions, or privileges of employment; and (5) the employer knew or should have known of the harassment and took no effective remedial action. *EEOC v. Appalachian Power Co.*, Case No. 1:18CV00035, 2019 WL 4644549, at *6 (W.D. Va. Sept. 24, 2019) (citing *Okoli v. City of Balt.*, 648 F.3d 216, 222 (4th Cir. 2011)). On element four, the "acceptance or rejection of the harassment must be an express or implied condition to the receipt of a job benefit or cause of a tangible job detriment to create liability,"[6] and "the employee must prove that she was deprived of a job benefit which she was otherwise qualified to receive because of the employer's use of a prohibited criterion in making the employment decision." *Id.*

[6] Defendants state that it is "unclear" whether the denial of a raise can be a tangible employment action, but they concede that the denial of a raise can "function as an adverse action in some circumstances." (Defs.' Br. 14, Dkt. No. 22 (citing cases).)

Defendants argue that Thomas did not allege facts sufficient to draw a causal connection between Palmer's proposition for sex and the denial of the raise. Moreover, Thomas never explicitly pleads that the denial of the raise she inquired about was caused by her refusal to have sex with Palmer. Defendants focus on the explicit request for sex by Palmer from Thomas over Memorial Day weekend, but the clear implication from Palmer's conduct both before and after that request is that he wanted sex from Thomas, or at least some type of romantic relationship, even if he stopped explicitly asking for it. In this context, Palmer's "sexually suggestive" conduct in response to Thomas' inquiry about the status of her raise, followed by the denial of her raise soon after, allows the court to plausibly infer that the reason for the denial was Thomas' repeated rejection of Palmer's sexual advances.

Defendants also argue that Thomas fails to allege that she was qualified to receive the raise. Thomas does allege, however, that she was promised a raise. If Thomas was promised a raise, it is reasonable to presume that she was qualified for it. Finally, defendants argue that that Palmer's statement that he would follow up with Thomas' supervisor, along with his statement that City Council needs to approve raises, implies that Palmer did not have the authority to give Thomas a raise. At this stage, the court must draw all reasonable inferences in Thomas' favor, and it is reasonable to infer that Palmer was able to influence whether Thomas received a raise.

For all of these reasons, the court concludes that Thomas states a claim for quid pro quo sexual harassment.

**D. Hostile Work Environment**

To establish a hostile work environment sexual harassment claim, a plaintiff must prove that: (1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer. *Young*

*v. Housing Auth. of Balt. City*, Civil Action No. MJG-17-713, 2017 WL 5257127, at *7 (D. Md. Nov. 13, 2017) (citing *Spicer v. Com. of Va., Dep't of Corr.*, 66 F.3d 705, 710 (4th Cir. 1995)). In assessing whether a work environment is objectively hostile, it is necessary to consider "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 459 (4th Cir. 2002).

Defendants argue that the conduct described by Thomas does not rise to the level of creating a threatening, intimidating, or abusive work environment. Defendants also fault the complaint for lacking enough specific detail about Thomas' alleged encounters with Palmer, and that she fails to describe with any particularity exactly when and for how long Palmer attempted to engage her in conversation about the proposition to have sex over Memorial Day weekend. These arguments ignore the basic premise of evaluating a motion to dismiss that the court must draw all reasonable inferences in favor of Thomas, the non-moving party. Being the subject of repeated, unwanted sexual advances can certainly form the core and the basis of an objectively hostile work environment. The details of these encounters matter to Thomas' ultimate ability to prevail, but, for now, Thomas has plausibly alleged a hostile work environment claim.

## III. CONCLUSION

For these reasons, it is HEREBY ORDERED that the court's Memorandum Opinion and Order (Dkt. No. 27) is VACATED.

It is FURTHER ORDERED that defendants' motion to dismiss (Dkt. No. 11) is DENIED as

moot and defendants' motion to dismiss the first amended complaint (Dkt. No. 21) is DENIED.

Entered: June 15, 2020.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge